John and Betty MacGuire v. Commissioner.
MacGuire v. Commissioner
Docket No. 6351-65.
United States Tax Court
T.C. Memo 1970-89; 1970 Tax Ct. Memo LEXIS 273; 29 T.C.M. (CCH) 414; T.C.M. (RIA) 70089; April 20, 1970, Filed *273 Towner Leeper, 7th Floor Southwest National Bank Bldg., El Paso, Tex., for the petitioners. Ralph V. Bradbury, Jr., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in the petitioners' Federal income tax for the taxable year 1961 in the amount of $436,521.74. The issue for our decision is whether petitioners' receipt of $700,000 in 1961 is taxable as 415 capital gain or as ordinary income or alternatively, whether any or all of this sum is a nontaxable distribution in liquidation of a Mexican corporation, the liquidation having occurred in 1952. Findings of Fact Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference. Petitioners John and Betty MacGuire, husband and wife (hereinafter referred to as petitioner, and Betty) resided in El Paso, Texas at the time the petition herein was filed. They filed a joint Federal income tax return for 1961 with the district director of internal revenue in Austin, Texas. In 1942, Lee Moor, Betty's father, formed a Mexican corporation, Compania Ganadera Sahuarito (Sahuarito). The charter provided for *274 the issuance of 3,000 shares of bearer stock with a par value of 100 pesos. Fernando Villalobos (Villalobos) was secretary and bookkeeper of Sahuarito. In 1947, the stock of Sahuarito was held by the following individuals: Shareholder
Shares
Percent
Lee Moor
1,950
65
F. Villalobos
450
15
Ashley Mershon
300
10
R. F. Cook 300
10
3,000
100
Prior to this time all of the stock was in the possession of Lee Moor. He contributed $129,222.06 worth of assets for his shares. Villalobos signed a letter agreement for his shares. There is no indication that he ever paid for his 15 percent interest. R. F. Cook was a long time employee of Lee Moor, and signed a letter agreement for his 300 shares valued at $12,922.20. He was to pay for these from the earnings of Sahuarito. The only indication of any payment is a notation on the back of the letter agreement: "1-1-47 - Paid $3,094.74" (However, Cook could not remember if in fact he did pay such an amount.) Ashley Mershon, was also an employee of Lee Moor. He contributed his own cattle to Sahuarito in return for his 300 shares valued at $12,960. Under its Mexican charter Sahuarito was empowered to perform all types of operations relating to the cattle business but explicitly *275 excluded from acquiring land. This was so because Lee Moor, an American, was a shareholder of Sahuarito. To obtain land necessary for the cattle business, title was taken in the names of straw owners who acquired the land with funds supplied by Lee Moor. In addition, Villalobos leased property he owned to Lee Moor although he could not recall if Lee Moor paid any rent. In all, Sahuarito had the use of land totaling over 500 sections or in excess of 300,000 acres. The cattle on Sahuarito were imported purebred red, baldfaced Hereford animals, used for breeding purposes, most of which were registered. The offspring of these animals were sold for slaughter. Due to the need to control hoof and mouth disease, the United States periodically prohibited the importation of live cattle from Mexico. The border was closed on December 26, 1946 and reopened on September 1, 1952. During this period, cattle were sold to packing plants and to a butcher in Juarez. In 1950, Mershon quit. He, as foreman of Sahuarito, turned over 5,400 head of cattle from the fall roundup to the new foreman and withdrew his original contribution of cattle which was something over 400 head. He turned his 300 shares of stock *276 over to Lee Moor. It was retained as treasury stock. Cook quit in July of 1950 and offered his 300 shares back to Lee Moor. Moor instructed Cook to give the shares to petitioner and Cook did so within the following six months. These shares were recorded on petitioner's books, by his accountant, on September 30, 1960. In 1950 Lee Moor became interested in acquiring another ranch 120 miles south of Sahuarito, known as Terrenates and owned 98 percent by one Joe Peyton and 2 percent by one Antonio Bermudez. Terrenates was a Mexican limited liability company having variable capital. No stock was issued. Ownership was reflected in two registers: one reflecting variable and the other minimum capital. Terrenates is taxable as a corporation. On November 3, 1950, the original owners of Terrenates transferred their interests to Lee Moor and Villalobos in the respective percentages of 98 percent and 2 percent. In 1951, Lee Moor transferred 90 percent of his 98 percent interest to petitioner and in 1954 he transferred the remaining 8 percent to Betty. Petitioner paid nothing, at any time, for his interest in Terrenates. On or about September 13, 1951, while Mershon was visiting Sahuarito, he was *277 informed that the Sahuarito lands had been sold by the Mexican Government to 416 Mexican citizens and that if the cattle were not removed, they would be sold as strays. Mershon was further advised of this by a Mexican judge. Villalobos was also informed. Mershon then met with Lee Moor and Villalobos and was asked to remain and aid in moving the cattle. Mershon agreed, and supervised the fall roundup of Sahuarito cattle. There was a total of 5,400 to 5,500 head moved off Sahuarito. Some went to Terrenates and the others to a packing house in Juarez. By the spring of 1952 all of the cattle had been moved from Sahuarito. The cattle shipped to Juarez consisted of over 1,200 head on the first shipment, follows by several smaller shipments. These cattle were older cattle to be used for slaughter. Approximately 2,950 head were shipped to Terrenates consisting of: 2,000 cows; 100 bulls; 800 two-year old heifers; and some yearlings. As of June 30, 1952, the only asset shown on Sahuarito's books was a receivable due from Terrenates in the amount of $47,350.87. By December 31, 1952, there was no amount owing. In January 1953, Villalobos had possession of all the stock of Sahuarito except that *278 issued to Cook and then held by petitioner. This enabled him to file a formal notice of suspension of operation as to Sahuarito with the Mexican Government. Petitioner was periodically on Sahuarito from 1947 through 1952. He participated in his first roundup in the fall of 1950. He was also periodically present at Terrenates but did not begin managing it until Lee Moor became ill in 1957. Lee Moor died on December 15, 1958 at which time he owed Terrenates $467,641.09. Thereafter, petitioner contacted Villalobos and learned that they were the last remaining stockholders of Sahuarito. Neither of them knew of any effort by Sahuarito or its shareholders to collect from Terrenates any money due for cattle shipped to Terrenates in 1951 and 1952. Petitioner never saw the books and records of either company nor did he know of any interest that might have been paid to Sahuarito by Terrenates on any accounts that might have been owed Sahuarito. Petitioner's bookkeeper first became aware of petitioner's 300 shares of Sahuarito in early 1959. Petitioner stated then that the certificates were worthless. Petitioner's balance sheets for December 31, 1958 and 1959 do not reflect any interest or value *279 for the stock. Between July 31, 1958 and December 31, 1960, petitioner borrowed a total of $577,019.66 from Terrenates and issued his personal notes therefor. Petitioner's purpose behind this borrowing was to accumulate as much Terrenates money as possible within the United States. The funds were obtained by petitioner by his receiving and depositing to his personal bank accounts checks payable to Terrenates and by his writing checks on the Terrenates checking account at the State National Bank of El Paso as follows: [1]
July 31, 1958
Payment by Lee Moor Contracting Co. to Terrenates deposited to a personal bank account of John MacGuire
$56,000.00
Nov. 14, 1958
Payment by Jack Black Cattle Co. to Terrenates deposited to a personal bank account of John MacGuire
$34,722.80
Less Terrenates' expenses paid by John MacGuire 1,168.60
Net proceeds
33,554.30
Jan. 18, 1959
Check from Terrenates on State National Bank of El Paso
281,200.00
Jan. 1, 1959
Payment by Blythe Farm to Terrenates received and de- posited to a personal bank account of John MacGuire
10,065.36
Feb. 17, 1959
Check from Terrenates on State National Bank of El Paso
20,000.00
May 1959
Check from Terrenates on State National Bank of El Paso
15,000.00
Dec. 31, 1959
Check from Terrenates on State National Bank of El Paso
100,000.00
Feb. 22, 1960
Check from Terrenates on State National Bank of El Paso
7,000.00
Feb. 26, 1960
Check from Terrenates on State National Bank of El Paso
11,700.00
Mar. 11, 1960
Check from Terrenates on State National Bank of El Paso
20,000.00
Mar. 24, 1960
Check from Terrenates on State National Bank of El Paso
15,000.00
Aug. 22, 1960
Check from Terrenates on State National Bank of El Paso 7,500.00
Dec. 31, 1960
Total Notes $577,019.66
*280 Only petitioner could sign checks on this bank. On or about December 15, 1960, petitioner drew a check for $50,000 and opened a checking account at the Chelmont State Bank in El Paso, Texas in the name of Terrenates. Again petitioner was the only person authorized to write checks at this bank. The funds borrowed from Terrenates by petitioner consisted of the $467,641.09 due from the Lee Moor Estate and balances due from other creditors. None of the deposits made by petitioner to the American banks could be identified by him, as to source, as belonging to Sahuarito. Villalobos also could not identify the sources of these deposits. All of the monies used by petitioner for his loans were deposited in bank accounts in El Paso rather than to the Terrenates account in Juarez. Villalobos did not know why the amount paid by the Lee Moor Estate to Terrenates was deposited in El Paso and not Juarez, and further he was not informed in January 1959 that this amount had been paid, at the time it was paid. The notes executed by petitioner in connection with the monies borrowed from Terrenates were *281 prepared at the insistence of petitioner's auditor, George Angelos, who wanted petitioner's obligation to Terrenates recognized for the amounts already received and deposited in accounts under the control of petitioner. Villalobos did not know petitioner was executing notes for monies belonging to Terrenates. Villalobos did not ever come into receipt of the notes, though he was secretary of Terrenates. Petitioner's balance sheet as of December 31, 1960 showed 300 shares of Sahuarito with a memo cost of $1.00 and a fair market value of $700,000. This latter figure was supplied to Angelos by petitioner. On January 31, 1961, petitioner withdrew $700,000 from the two Terrenates' accounts. This was accomplished as follows: On January 31, 1961, petitioner borrowed $600,000 from the First National Bank of Dallas through the Chelmont State Bank and deposited the loan in his personal account. He paid what he owed Terrenates in the amount of $577,019.66, plus interest of $21,370.97, for a total payment of $598,390.63, depositing the check in the Terrenates checking account at the Chelmont State Bank. Petitioner received two checks from Terrenates. One of the checks was in the amount of $655,000 *282 drawn on the Terrenates checking account at the Chelmont State Bank. The other check was in the amount of $45,000 and drawn on the Terrenates checking account at the State National Bank of El Paso. The two checks totaling $700,000 were deposited to the personal account of petitioner at the Chelmont State Bank. On the next day, February 1, 1961, petitioner went to the Chelmont State Bank where a deposit was made to the Terrenates checking account in the amount of $10,000. Also on February 1, 1961, petitioner drew a check on his personal account in the amount of $600,083 payable to the Chelmont State Bank in El Paso, Texas covering his personal loan of $600,000 and interest for one day in the amount of $83.00. The $45,000 check mentioned above overdrew the Terrenates checking account at the State National Bank of El Paso by $2,568.68. To cover the overdraft, petitioner drew a check for $2,568.68 on the Terrenates account at the Chelmont State Bank and deposited it at the State National Bank of El Paso, thereby closing that account. Petitioner told his bookkeeper, Hubert Gibbons, on January 31, 1961, that he was selling 100 shares of Sahuarito stock to Terrenates for $700,000. Gibbons *283 reflected on the books of the petitioners the events of January 31, 1961 and February 1, 1961, as he understood them, that is, that petitioner had sold 100 shares of his Sahuarito stock and had used some of the proceeds to pay off his obligation to Terrenates. In connection with the above transactions, Villalobos could not remember when he had his first conversation with petitioner in regard to the withdrawal of the $700,000 from Terrenates. He testified he did not remember whether the 300 shares of Sahuarito stock belonging to petitioner played any part in an agreement between him and petitioner. The agreement was that he would get more stock in Terrenates and petitioner would retain the $700,000 taken from the El Paso banks by petitioner; and the agreement in this connection was reached with petitioner on April 9, 1961. However, Villalobos did not know whether the $700,000 had been withdrawn from the Terrenates accounts before or after this understanding with petitioner. Nor did he remember receiving any Sahuarito stock 418 from petitioner. Villalobos stated he received the following assets of Terrenates in addition to an interest in land and cattle in exchange for petitioner keeping *284 the $700,000: Assets
Value in Pesos
Machinery and equipment
Mex $114,429.75
Buildings
222,942.71
Stock
60,260.00
Accounts receivable from Juarez
27,289.65
Accounts receivable from Lee Moor Ranch
351,381.48
Cash
194,277.75
Accounts receivable from John MacGuire
360,355.99
Accounts receivable from F. A. Villalobos
150,000.00
Advances to employees
49,872.00
Total
Mex $1,530.809.33
Villalobos stated these amounts represented the actual value of the property. The 1,530,809.33 pesos amounted to $122,465 U.S. money in 1961, and this amount is before the liabilities and the reserves of the business. There was no written agreement between petitioner and Villalobos in regard to the $700,000 transaction. Villalobos was under the impression that the aforementioned 300 shares of Sahuarito were in the possession of Cook. Petitioner did not know the exact date the 300 shares were turned over to Villalobos. On or about April 9, 1961, Villalobos went to an attorney to prepare the necessary papers to reflect the additional interest of 50 percent to him in Terrenates. The attorney advised him he would have to request permission of the Foreign Office in Mexico City to effect a transfer of ownership interest to him. The attorney *285 filed his first petition with the Foreign Office in November 1961, to effect the transfer of the ownership interest. The petition was denied because the Foreign Office insisted that Mexican citizens should own 51 percent interest in the business. After petitioner agreed to Villalobos' owning 55 percent of Terrenates, on February 20, 1962, a second petition was filed with the Foreign Office which was approved on March 20, 1962. On March 24, 1962, the ownership register of Terrenates was changed to reflect a 55 percent interest in Terrenates by Villalobos and his wife and a 45 percent interest by petitioner and Betty. The latest entry in the ownership register theretofore was on April 9, 1954, when the interest of Lee Moor was transferred to Betty. The minutes of Terrenates dated April 9, 1961, state that petitioner was authorized to transfer a portion of his share in the company and that Villalobos would attend to the necessary formalities as stated above. Under date of December 21, 1962, Villalobos executed a certification on the letterhead stationery of Sahuarito that the stock in Sahuarito owned by petitioner "was sold by the undersigned to Mexican Citizens," and that "The proceeds *286 of this sale were turned over in Mexico to Cia. Ganadera de Terrenates, S. de R.L. de C.V. and this corporation authorized * * * to withdraw this funds from their account in El Paso bank." On January 24, 1963, Villalobos executed a certification on the letterhead of Sahuarito to the effect that after the sale of the 300 shares of Sahuarito stock owned by petitioner, all of the stock of Sahuarito was owned by Mexican individuals. On their joint Federal income tax return for taxable year 1961, petitioner reported the $700,000 as a long-term capital gain representing the sale of 100 shares of Sahuarito. The Commissioner denied the deduction for long-term capital gain stating "It is determined that the $700,000.00 received from or through * * * is taxable as ordinary income rather than as a long-term capital gain." In September 1964, petitioner told revenue agent Felix Lopez in the presence of George Angelos; Towner Leeper, petitioner's lawyer; and James Stranger, Lopez's supervisor, that the $700,000 in cash received from Terrenates represented the sale price of 300 shares of Sahuarito stock. Angelos stated it was his error that the 1961 tax return of the petitioner reflected the sale *287 of 100 shares of Sahuarito stock instead of 300 shares as should have been reflected on the return. Petitioner was asked at this conference how the $700,000 sales price was arrived at. He replied he did not handle the sale, that the sale was handled by Villalobos. Petitioner stated he did not know who the purchaser was. Lopez then discussed the $700,000 transaction with Villalobos. Villalobos advised Lopez that the Sahuarito stock belonging to petitioner had been sold to one Jose Terasas. Villalobos could not explain how the $700,000 sales price was determined. Lopez inquired how much the stock of Sahuarito was worth, and Villalobos told him Sahuarito's land had been appropriated and its cattle sold. 419 Lopez suggested in this connection that after the land was appropriated and the cattle sold, Sahuarito would have no assets, and Villalobos replied that Sahuarito might have had money received from the sale of cattle. This was the entire explanation of Villalobos for the $700,000 transaction. Villalobos did not make any contention at this meeting that an element in the $700,000 transaction was the transfer to him from petitioner of an ownership interest in Terrenates. Opinion We must *288 decide if the $700,000 received by petitioners in 1961 is taxable as longterm capital gain as an amount realized in the disposition of their interests in two Mexican companies: Sahuarito and Terrenates. Alternatively, petitioners contend that all or a portion of the $700,000 was a nontaxable return of capital representing a distribution in liquidation of Sahuarito which was liquidated in 1952. The Commissioner presents no affirmative theory of taxation as to the capital gain aspect of petitioners' argument. He relies on the presumption of correctness attaching to his determination. Therefore, the burden of proof rests on petitioners to present evidence sufficient to overcome this presumption. Rule 32, Tax Court Rules of Practice. As to petitioners' alternative position, the Commissioner concedes that Sahuarito was liquidated in 1952, however, he maintains that such amount was not a distribution in liquidation in 1961, and even if it were, the amount of distribution was not ascertainable in 1952 and therefore was subject to tax in 1961. We are not persuaded by petitioners' arguments as to either position. The record is not at all clear. Indeed it is extremely cloudy and we have endeavored *289 in our Findings of Fact to present as best we can a reasonably accurate description of what happened in re the $700,000 transaction. However, what emerges is still a confused, sketchy and basically highly implausible factual setting on which petitioner relies. Capital Gains Petitioners present three theories in support of their capital gains claim. The first, as shown on their 1961 return, is a sale of 100 shares of Sahuarito to Terrenates. The second, advanced at the 1964 conference with agent Lopez, is a sale of 300 shares of Sahuarito to one Jose Terasas The third, advanced at trial, is the disposition of the stock of Sahuarito and an interest in Terrenates to Villalobos. We have trouble believing any or all of these descriptions. First, even assuming that petitioners meant to show a 300-share sale on their return, the question remains who would pay $700,000 for an interest in a company liquidated nine years before? As to petitioners' argument concerning both Sahuarito and Terrenates, if this were in fact what took place, why was this not put forth at the 1964 conference? Petitioner's response, that it was not the business of his bookkeeper, accountant, or the Internal Revenue *290 Service, is not adequate. Petitioners ask us to view the transaction as would a layman, contending that petitioner himself is a layman. Accordingly, says petitioner, he "had control of $700,000.00 form Terrenates which he figured was the maximum he could get for his interest in Sahuarito; in order to keep it peacefully he had to give up a 48% interest in Terrenates to Vollolobis: to * * * what he got paid for was his interest in Sahuarito which to him meant 300 shares of stock and he so described the transaction. To * * * his cost of making the deal was his having to give up a 48% interest in Terrenates." Petitioner asks us to believe that he is so naive in the ways of the tax law, that such a response is sufficient. On the record before us we simply cannot do so. We are deeply disturbed by the contradictory nature of some of the testimony at trial, specifically that relating to the 300 shares of Sahuarito. This same facet of petitioners' case also troubled the Commissioner and we cannot state any better than he did on brief some of the more troublesome and contradictory points, to wit: How can one reconcile the original claim of Mr. Villolobis that he sold the 300 shares of stock *291 of Mr. MacGuire in Sahuarito to a Mr. Jose Terasas, and embellish his claim with the details that the proceeds were put in a Terrenates bank account in Mexico and that Terrenates permitted Mr. MacGuire to withdraw the sales price from its bank account in the United States, with his claim at the trial that the Sahuarito stock of Mr. MacGuire was not actually sold by him, but he let Mr. MacGuire keep the $700,000 taken from the Terrenates bank accounts in El Paso in return for Mr. MacGuire turning in his 300 shares of Sahuarito stock, Mr. MacGuire transferring to him an interest in Terrenates and his agreeing not to sue Mr. MacGuire? How can one reconcile the testimony of Mr. MacGuire that the 300 shares of 420 Sahuarito stock were transferred away from him in connection with his agreement with Mr. Villolobis, and the testimony of Mr. Villolobis that he did not remember if the 300 shares of stock were mentioned by him and Mr. MacGuire and whether the shares played any part in connection with their negotiations? * * * [How can one explain] that with the disposition of 300 shares of Sahuarito stock by Mr. MacGuire claimed to be an integral part of the $700,000.00 transaction, that at *292 the trial Mr. Villolobis did not remember receiving any Sahuarito shares from Mr. MacGuire? How can one reconcile the testimony of Mr. Villolobis that the disposition of the 300 shares of Sahuarito stock of Mr. MacGuire that formerly belonged to Mr. Cook was an integral part of the $700,000.00 transaction with his testimony that in 1962 he thought Mr. Cook still had his 300 shares? And how can you reconcile this testimony with the testimony of Mr. Villolobis that he sold these same shares to Jose Terasas? Other portions of the record also present unanswered questions, which cast doubt on petitioners' contentions: Is it reasonable that Mr. MacGuire, who owned 98 percent of Terrenates and who had $700,000.00 under his complete control, would voluntarily go to a 2 percent owner who does not know of the $700,000.00 and suggest the transaction that is now alleged to have taken place? How can one reconcile Mr. MacGuire's claim that Terrenates was worth one and one-half million dollars on January 31, 1961, with his balance sheet prepared as of one month earlier on December 31, 1960, reflecting his 98 percent interest in Terrenates to have a fair market value of $100,000.00? None of the $700,000.00 *293 received by Mr. MacGuire could be identified by him as Sahuarito money. Why did Mr. MacGuire, who maintained a double entry set of books kept by a bookkeeper and audited by a firm of certified public accountants, not record the $700,000.00 transaction as it is now explained to the Court if the status of the circumstances on January 31, 1961, was as it is now claimed? Doesn't it seem peculiar that for a transaction of this size and magnitude, there was no written agreement? How can it be said there is a bona fide connection between the receipt by Mr. MacGuire on January 31, 1961, of $700,000.00 belonging to Terrenates and the transfer by Mr. MacGuire to Mr. Villolobis [sic] of an interest in Terrenates and stock in Sahuarito, when it was only after Mr. MacGuire "got my full amount, 700,000, * * *. Then I made my deal with Mr. Villalobos"? Why is it petitioners were unable to explain at the trial even approximately how much of the $700,000.00 received by Mr. MacGuire was in liquidation of Sahuarito and how much was received by him for transferring an interest in Terrenates to Mr. Villolobis [sic]? In attempting to show a connection between the receipt by Mr. MacGuire of $700,000.00 and *294 the transfer by Mr. MacGuire to Mr. Villolobis [sic] of an interest in Terrenates and stock in Sahuarito, how can one reconcile the testimony of Mr. Villolobis [sic] that the deal with Mr. MacGuire was not made until April 9, 1961, with the fact that Mr. MacGuire took over to himself on January 31, 1961, complete possession of the $700,000.00 and expended almost all of this amount on his personal obligations on the same date? Petitioners' responses, on brief, to these questions raised by the Commissioner, which we consider significant, are at best only surface ones. They do not, for the most part, touch upon the point questioned, and in some instances are unresponsive or evasive. In light of the foregoing, we cannot say that petitioners have carried their burden of proof. We are not convinced that the $700,000 transaction is entitled to capital gains treatment, therefore we hold the petitioners' taxable on the money as ordinary income under the provisions of section 61, Internal Revenue Code of 1954. Liquidation Distribution The parties agree that Sahuarito was liquidated in 1952. Petitioners argue that the 1961 receipt of $700,000 was a delayed distribution pursuant thereto and therefore *295 not taxable in 1961. They contend that the value of Sahuarito's assets was ascertainable in 1952 and therefore taxable at that time and not in 1961 when finally distributed to petitioner. The Commissioner counters by arguing that the 1961 receipt of $700,000 would be as petitioners contend only if it was in fact a distribution in liquidation and the amount of the distribution was ascertainable in 1952. Again, we hold against petitioners. No evidence was presented to us which would 421 support the claim that this money was in fact a distribution in liquidation of Sahuarito. Petitioners assume that this was the nature of the payment and devote considerable time, on brief, detailing the value of Sahuarito in 1952. Sahuarito itself made no payment, and there is no indication that the two remaining shareholders of Sahuarito ever considered the transaction to be a liquidating one. As discussed above, relative to the capital gains argument, there is so much contradictory and confusing testimony concerning the 300 shares of Sahuarito, and from this we cannot say that this transaction contemplated a distribution in liquidation of Sahuarito. Decision will be entered for the respondent. Footnotes
1. The amounts, dates and descriptions of the transactions are taken from the stipulation of the parties.↩